AKIN, GUMP, STRAUSS HAUER & FELD LLP
CHAD A. STEGMAN (SBN 225745)
580 California Street, Suite 1500
San Francisco, CA 94104-1036
Phone: (415) 765-9500
Fax:   (415) 765-9501
cstegeman@akingump.com

AKIN, GUMP, STRAUSS HAUER & FELD LLP
RICHARD N APPEL (*Pro Hac Vice* application to be submitted)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 887-4076
Fax:   (202) 887-4288
rappel@akingump.com

HOLLAND & HART LLP
John M. Husband, P.C. (*Pro Hac Vice* application to be submitted)
Thomas E.J. Hazard, P.C. (*Pro Hac Vice* application to be submitted)
Christina F. Gomez (*Pro Hac Vice* application to be submitted)
555 Seventeenth Street, Suite 3200
Denver, Colorado 80201-8749
Phone: (303) 295-8228
Fax:   (303) 975-5381
jhusband@hollandhart.com
tehazard@hollandhart.com
cgomez@hollandhart.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH CAMPBELL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> APARTMENT INVESTMENT AND MANAGEMENT COMPANY, AIMCO PROPERTIES, L.P. and NHP MANAGEMENT, INC., <br><br> Defendants. | Case No. 07-CV-03640 SC <br><br> **DECLARATION OF CHAD A. STEGEMAN IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS CERTAIN PLAINTIFFS** <br><br> Hearing Date: September 5, 2008 <br> Time:         10:00 a.m. <br> Before the Hon. Samuel Conti |

I, Chad A. Stegeman, declare as follows:

1. I am an attorney with the law firm of Akin Gump Strauss Hauer & Feld, LLP, counsel to Defendants Apartment Investment and Management Company, AIMCO Properties, L.P., NHP Management Company, and AIMCO/Bethesda Holdings, Inc. (collectively, "Defendants") in this matter. I am a member of good standing of the Bar of California and the Bar of this Court. I have personal knowledge of the facts in this Declaration unless otherwise stated and could competently testify to them if called as a witness. I make this declaration in support of Defendants' Motion to Dismiss Certain Plaintiffs.

2. Defendants propounded discovery requests on all Plaintiffs in this action, including Patrick Moxley and Damian Zentner, in October 2007. Defendants previously agreed to two extensions of the deadline to respond to that discovery, bringing the deadline to January 11, 2008.

3. To date, Defendants have received no discovery responses from either Patrick Moxley or Damian Zentner. Nor have Defendants received any discovery requests or any other communication from these two Plaintiffs.

4. Attached hereto as Exhibit A is a true and correct order dated March 28, 2007, decertifying a collective action under the Fair Standards Labor Act in Chase v. AIMCO, Civ. No. 1:03-CV-01683 (D.D.C. Mar. 28, 2007).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 18th day of July, 2008, in San Francisco, California.

/s/ Chad A. Stegeman
Chad A. Stegeman

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILLIAM T. CHASE, et al.,      :
                                :
        Plaintiffs,             :
                                :
    v.                          :  Civil Action No. 03-1683 (JR)
                                :
AIMCO PROPERTIES, L.P.,         :
                                :
        Defendant.              :

### MEMORANDUM ORDER

Plaintiffs, nine individuals employed as hourly-paid maintenance workers by defendants AIMCO Properties and NHP Management Company, seek a collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). In a previous order, I conditionally certified a class of "all individuals employed by defendants as maintenance technicians at any time since August 7, 2000"[1] so that plaintiffs could notify putative class members and seek opt-ins. 374 F.Supp.2d 196, 202 (D.D.C. 2005). Plaintiffs have done so, understanding that their collective action can be fully certified only if the class members are "similarly situated" as required by FLSA. Now pending before the court is defendants' motion to decertify [#202], asserting that plaintiffs cannot satisfy that requirement. For the reasons that follow, I find the motion to be well taken.

---

[1] Specifically, the proposed class covered anyone employed as hourly-paid "Service Technicians" or "Maintenance Supervisors" or "Service Managers," or in "other job titles performing similar duties." Am. Compl. ¶ 4.

## BACKGROUND

Defendants own and operate over 1,700 apartment communities located throughout the nation, at which they have employed more than 10,500 maintenance technicians like the plaintiffs. Those employees have been and are required to be "on call" outside of their regularly assigned work hours, in order to respond to tenant requests for service or repair. The plaintiffs here, all maintenance technicians, assert two claims: (1) non-payment for overtime hours worked, and (2) non-payment for time "on-call."

An FLSA "collective action" may be prosecuted by an employee on his or her own behalf and on behalf of "other employees similarly situated." 29 U.S.C. § 216(b). A collective action differs from a Rule 23 class action in two key respects. First, all FLSA plaintiffs must "opt-in" by consenting in writing to the court. Id. Second, FLSA collective actions are not subject to the numerosity, commonality, and typicality requirements of class actions under Rule 23. Hunter v. Sprint Corp., 346 F.Supp.2d 113, 117 (D.D.C. 2004). See also Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1105 (10th Cir. 2001) ("Congress clearly chose not to have the Rule 23 standards apply...and instead adopted the 'similarly situated' standard.'").

The FLSA does not define the term "similarly situated," id. at 1102, and courts have adopted several different approaches for making that determination. The most common of these, the "ad hoc" approach,[2] calls for a two-step evaluation of "the distinct legal and factual similarities and differences between and among class members' legal claims." 374 F.Supp.2d at 200. At the first step, the court may conditionally certify the class and permit plaintiffs to issue notice upon nothing more than a "modest factual showing sufficient to demonstrate that [putative class members] and potential plaintiffs together were victims of a common policy or plan that violated the law." Id., quoting Hoffmann v. Sbarro, Inc., 982 F.Supp. 249, 261 (S.D.N.Y. 1997). See also Mooney v. Aramco Services Co., 54 F.3d 1207, 1214 n.8. (5th Cir. 1995)(requiring at the first stage only "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination.")(emphasis added; internal citations omitted). At the second step, however - usually triggered by a defense motion to decertify - the court must make a determination of whether the class members are actually similarly situated. 374 F.Supp.2d at 200.

---

[2]The Court of Appeals for the D.C. Circuit has not adopted this or any other approach. The ad hoc approach has been used by other judges on this court, however. See Hunter v. Sprint Corp., 346 F.Supp.2d 113 (D.D.C. 2004)(Bates, J.); Hyman v. First Union Corp., 982 F.Supp. 1 (D.D.C. 1997)(Lamberth, J.).

My previous ruling in this case adopted the ad-hoc approach and permitted plaintiffs to move past the first step. I found that "[t]he record as it now stands does not support a collective action on either of plaintiffs' theories." Id. at 201. Nevertheless, I saw "little prejudice to the defendant" in conditionally certifying the class and allowing plaintiffs to go forward with issuing notice. Id.

Notice was duly issued, and more than 1,100 putative class members filed opt-in papers, with 889 asserting "waiting-time" claims and 872 asserting "unpaid overtime" claims.[3] The expected defense motion to decertify has been filed and fully briefed. It is time to decide whether the plaintiffs really are similarly situated.

Plaintiffs no longer defend the class they first proposed. Instead, they propose two "subclasses": one for employees with waiting time claims, and another for employees with unpaid overtime claims. The proposed "waiting time subclass" has 115 members. It consists of plaintiffs who "were subject to the AIMCO policy that, while on call, they must respond in person within approximately 20 minutes to emergency tenant requests" and who "responded to more than 20 calls each week that they were on-call." Pls.' Opp. at 31. The "unpaid

---

[3]These numbers, calculated by defendants, are unchallenged by plaintiffs.

- 4 -

overtime subclass" has 378 members.[4] The record does not disclose why so few of the 1,100-plus employees who opted in are included in the subclasses.

## ANALYSIS

There is no established standard of review for the second step of the ad hoc approach. It is clear, however, that the second step must be "higher" than the first, Thiessen v. General Elec. Capital Corp., 996 F.Supp. 1071, 1080 (D. Kan. 1998), or "stricter," Smith v. Heartland Auto. Servs., Inc., 404 F.Supp. 2d 1144, 1149 (D. Minn. 2005). Plaintiffs contend that the "touchstone" consideration is whether the case can be manageably adjudicated,[5] but most district courts at the second step have considered three factors: (1) the similarity - or disparity - of the factual and employment settings of the individual plaintiffs; (2) the defenses that appear to be individual to each plaintiff; and (3) procedural considerations and overall fairness. Moss v. Crawford & Co., 201 F.R.D. 398,

---

[4]Plaintiffs initially filed 346 affidavits for their unpaid overtime subclass and later moved for leave to file additional affidavits in support of their proposed subclasses. The motion [#207] will be **granted** as to the unpaid overtime subclass. As the parties now agree, the motion as to the waiting time subclass is **moot**.

[5] In my previous ruling, I noted that it is "difficult to tease out any standard for decision out of these so-called ad hoc decisions," 374 F.Supp.2d. at 200, and it may be that "what is 'similarly situated' enough for collective action treatment under the FLSA is a matter for the sound discretion of trial courts, guided mostly by Rule 23(b)(3)-like considerations of manageability and efficiency." Id.

- 5 -

409 (W.D.Pa. 2000). See also Thiessen, 996 F.Supp. at 1080; Sharer v. Tandberg, Inc., Civ. No. 06-0626, 2007 WL 676220, *2 (E.D. Va. 2007); Vaszlavik v. Storage Technology Corp., 175 F.R.D. 672, 678 (D.Colo. 1997). Manageability is an important factor, but it cannot without more justify a finding that class members are similarly situated.

During the first step review in this case, when "[t]he record...[did] not support a collective action," 374 F.Supp.2d at 201, plaintiffs' "unpaid overtime" claim was supported only by "anecdotes, a few e-mails from and to supervisors, and an argument about the absence of AIMCO records." Their waiting time claim had "even less record support." Id. The question, then, is whether plaintiffs have improved the record enough to support a finding that the members of their proposed class are indeed similarly situated.

**(1) Unpaid Overtime Claim**

AIMCO Policy 203 requires nonexempt employees working more than 40 hours "to be paid at an overtime rate." Defs.' Ex. C. Although the company generally requires preapproval of most overtime work, a second policy memorandum provides that overtime "not approved in advance...still must be paid to the employee." Defs.' Ex. E. Plaintiffs do not challenge the authenticity or applicability of these documents. Plaintiffs' theory, however, is that, notwithstanding its written policies, AIMCO's common practice was not to pay overtime, and that this practice was the

natural and probable result of (1) the company's unrealistically low expectations for staffing, and (2) the company's policy of requiring preapproval for most overtime work. AIMCO acknowledges that "particular managers" might have been "confused" by AIMCO's policies, but says that the evidence "indicates nothing more than isolated and aberrant practices rather than a common policy." Defs.' Mot. at 38-39.

      The record consists of declarations and testimony of individual employees who say that they were not paid for overtime work. That evidence, without more, does not demonstrate the existence of a common, company-wide practice of non-payment of overtime. The e-mails and other management communications plaintiffs have placed on the record do not demonstrate the existence of a "nationwide illegal policy." England v. New Century Financial Corp., 370 F.Supp.2d 504, 511 (M.D.La. 2005). They reflect "local policies of various managers located at different sites." Id.

      The e-mail from Stephen Ira, upon which plaintiffs rely heavily, is a telling example. Ira is a company founder who, in 2001, e-mailed the vice-presidents and property managers within a single regional division (Southeast) ordering "no overtime period unless I personally approve it in advance of the time it is incurred." Pls.' Ex. 34. That e-mail, at least on its face, does not prohibit managers from paying employees who have already worked overtime.

- 7 -

Plaintiffs have made no effort to show how many, or which, of the "unpaid overtime" class members were employed in the Southeast region, at or after the time of this e-mail. The case plaintiffs have presented for certification, indeed, makes no attempt to show how region, or job title, or date of employment and overtime worked (and unpaid) makes the opt-ins "similarly situated." What the plaintiffs' "subclass" members appear to have in common is that they actually assert a claim. This amounts to certification by self-selection, ignoring everyone to whom the alleged "common practice" was <u>not</u> applied. Plaintiff's brief admits as much: "Whether other AIMCO employees outside of the unpaid overtime subclass were not subject to the AIMCO practices [of not paying overtime] is irrelevant to the claims of this subclass." Pls.' Opp. at 12. Plaintiffs envision a trial in which the jury hears "class-wide evidence" that AIMCO "effectively required many maintenance employees to work unpaid overtime responding to emergency calls." <u>Id.</u> at 13.[6] But what of all the employees who <u>were</u> paid for overtime? According to plaintiffs, they are "no longer relevant," <u>id.</u> at 12, but they are highly relevant to the proposition that AIMCO did <u>not</u> have a

---

[6]As defendants point out, the reliability of these declarations is suspect. For example, AIMCO's records indicate overtime payments made to 170 opt-ins who filed sworn affidavits stating that they never received any overtime pay. Second Supp. Decl. of Sherlyn Keiling, ¶ 3(g). In addition, many members of the proposed subclass were dismissed for poor performance or worked for less than the full 90-day probationary period. <u>Id.</u> ¶¶ 3(a), 3(f).

- 8 -

common practice of denying overtime compensation. The fact that fewer than 400 out of a possible 10,500 maintenance workers (less than four percent) assert a claim for unpaid overtime tends to prove the absence of a company-wide practice.[7] The 378 members were employed at at least 295 distinct properties in 41 states. See Second Supp. Decl. of Sheryln Keiling ¶ 3(a). There is no indication that the claims of the subclass members were concentrated in any particular region or part of the company. Under AIMCO's decentralized management structure, these employees were subject to individualized decisions at different locations by different managers and supervisors, each of whom, in denying overtime compensation, would have been acting contrary to the company's formal policy.

Several courts have refused to certify collective actions where, as here, individual claims and defenses predominate. See, e.g., Lusardi v. Xerox Corp., 118 F.R.D. 351, 370 (D.N.J. 1987), vacated in part and modified in part on other grounds by Lusardi v. Xerox Corp., 122 F.R.D. 463 (D.N.J. 1988); Brooks v. BellSouth Telecommunications, Inc., 164 F.R.D. 561, 569 (N.D. Al. 1995); Bayles v. American Medical Response of Colorado, 950 F.Supp. 1053, 1067 (D. Colo. 1996). In many ways, this case

---

[7] Plaintiffs repeat the same circular argument about the waiting time class. "AIMCO has argued strenuously that this written policy was not uniformly applied throughout the country. Whether or not that claim is accurate, however, is now irrelevant." Pls.' Opp. At 7, n.3 (internal citations omitted).

- 9 -

is similar to Basco v. Wal-Mart Stores, Inc., 2004 WL 1497709 (E.D.La. 2004), in which the district court denied a motion for certification of a class consisting of "any and all" Wal-Mart employees in Louisiana who "[d]id not receive minimum or overtime wages" due to a series of corporate practice designed to control payroll costs. The court stated:

> [P]laintiffs seek to make a corporate policy to keep employee wage costs low sufficient proof to justify the creation of a class of all Wal-Mart employees that have not been properly paid overtime in the last three years. It is obvious from the discovery presented that this "policy" and its effects are neither homogeneous nor lend themselves to collective inquiry. The effects of the policy as alleged are anecdotal, that is to say particularized. Plaintiffs' own witnesses demonstrate that the "policy" was not even uniformly or systematically implemented at any given store. While it is true that this "lesser" standard should not preclude certification, and "similarly situated" does not mean identically situated, plaintiffs have failed in their burden of proof to demonstrate identifiable facts or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency.

Basco, 2004 WL 1497709, at *7. See also England v. New Century Financial Corp., 370 F.Supp.2d 504, 511 (M.D.La. 2005)("[I]f liability is found at one location, this would not necessarily require this Court to also find liability at another location.").

**(2) Waiting Time Subclass**

The waiting time subclass fares no better. In order to recover for such a claim under the FLSA, an individual plaintiff must show that she was "engaged to wait" and not "waiting to be

- 10 -

engaged." Skidmore v. Swift & Co., 323 U.S. 134, 137 (1944). In my previous memorandum, I warned plaintiffs that

> [T]he personal situations that may or may not give rise to liability are so varied that the prospect of finding enough "similarly situated" workers to make a collective action worthwhile appears dim. The plaintiffs have cited no case in which a waiting time claim was accorded collective action status, and I have found none.

374 F.Supp.2d at 201. As with the unpaid overtime subclass, nothing has changed except that plaintiffs have created a narrower subclass, consisting, now, only of employees who "were subject to the AIMCO policy that, while on call, they must respond in person within approximately 20 minutes to emergency tenant requests" and who "responded to more than 20 calls each week that they were on-call," Pls.' Opp. at 31.[8] Plaintiffs argue that this subclass meets the "similarly situated" criteria with respect to the "two primary factors for determining whether waiting time should be paid: (1) the degree to which they were restricted while on call; and (2) the frequency with which calls were received." Id.

Plaintiffs rely for this approach on Renfro v. City of Emporia, Kan., 948 F.2d 1529 (10th Cir. 1991), but that case is

---

[8]As defendants point out, there is reason to believe that not every member of the proposed subclass was in fact required to respond in person within 20 minutes to all tenant requests for emergency service. Defs.' Mot. at 23. Although AIMCO's "Benchmark" recommended such a response, it was not mandatory, and the record reflects statements from many employees confirming that they were able to respond to tenant requests by phone.

easily distinguished. First, although the <u>Renfro</u> court did indeed adjudicate waiting time claims for thirty-five emergency workers, they were all employed by (and in) one city. There were no opt-ins, so that the court had no need even to address the question of whether the plaintiffs were "similarly situated." Second, the <u>Renfro</u> plaintiffs presented a far stronger claim that they were "engaged to wait" than any plaintiff here. Those plaintiffs

> [C]ould not go out of town; they could not do simple things such as change their oil or work on their cars; they could not go to a movie or go out to dinner for fear of being called back; they could not be alone with their children unless they had a babysitter "on-call;" they could not drive anywhere with anyone when on-call (i.e., they must take separate cars in case of a callback); and, they were reluctant to participate in group activities for fear of being called away.

<u>Renfro</u>, 948 F.2d at 1532. In contrast, individual plaintiffs in this case acknowledge that they go to the movies, <u>see, e.g.</u>, Rosario Decl. ¶ 8, eat dinner, <u>see, e.g.</u>, Dority Decl. ¶ 9, and even sleep while on call, <u>see, e.g.</u>, Broadie Dep., Defs.' Second Supp. App. Ex. 2 at 61, 78.

      Plaintiffs' two-factor approach to waiting time claims is an incorrect statement of the law. Waiting time claims require one determination, whether "the restrictions placed on the employee preclude using the time for personal pursuits." 29 C.F.R. § 553.221(d). Plaintiffs' second factor - the frequency with which calls were received - is one of several considerations courts look to when making this determination. The Ninth

Circuit, for example, has listed the following additional factors:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive ; (5) whether the on-call employee could easily trade on-call responsibilities (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347, 350 (9th Cir. 1992).  See also Pabst v. Oklahoma Gas & Elec. Co., 228 F.3d 1128 (10th Cir. 2000)(considering the number of calls, required response time, and ability to engage in personal pursuits while on call).[9]  Plaintiffs have put forth no

---

[9]   Plaintiffs contend that whether employees engaged in a variety of activities is "immaterial." Pls.' Opp. at 38.  They cite only one case for that proposition, Armour & Co. v. Wantock, 323 U.S. 126 (1944), in which the Court "held on-call time to be compensable notwithstanding that the employees could sleep, play cards, and participate in other amusements while waiting for calls." Pls.' Opp. at 38 (citing Armour, 323 U.S. at 128). Plaintiffs fail to mention, however, that the employees in Armour were firefighters, who were prohibited from leaving the fire hall.  Armour, 323 U.S. at 127.  Given that there is no allegation in this case of a common practice requiring employees to stay on the premises while on call, plaintiffs' citation to Armour is distinguishable.

evidence suggesting that their proposed class members are similarly situated with regard to these other factors, and the record as it stands suggests otherwise. As with the proposed unpaid overtime subclass, the members of the waiting time subclass worked at a different facilities across the country. Indeed, the 115 putative class members worked at at least 91 different properties, located in 28 states. Supp. Decl. of Sheryln Keiling ¶ 3(a). The waiting time subclass cannot overcome the "disparate factual and employment settings of the individual plaintiffs" or "the various defenses available." Lusardi, 118 F.R.D. at 359.

* * * * *

For the foregoing reasons, defendants' motion to decertify [#202] is **granted**. The Clerk is directed to schedule a status conference.

                                    JAMES ROBERTSON
                              United States District Judge